UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND; and ARTHUR H. BUNTE, JR., as Trustee, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 11 C 6263 |
| WINGRA STONE COMPANY, a Wisconsin corporation, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, District Judge:

Now before the Court are Plaintiffs' Central States, Southeast and Southwest Areas Pension Fund's (the "Fund") and its trustee Arthur H. Bunte, Jr.'s motion for summary judgment and Defendant Wingra Stone Company's ("Wingra") cross-motion for summary judgment under Federal Rule of Civil Procedure 56. For the following reasons, the Fund's motion for summary judgment is granted, and Wingra's cross-motion for summary judgment is denied.

## BACKGROUND[1]

The Fund is a multi-employer trust fund governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Its principal office is located in Rosemont, Illinois. Wingra is a Wisconsin corporation that provides crushed stone products – limestone, sand, and gravel – for use in the construction industry in the Madison, Wisconsin area. Local Union No. 695 ("Local 695") is a labor organization affiliated with the International Brotherhood of Teamsters. It represents Wingra's truck drivers ("covered employees") for collective bargaining purposes.

Wingra services two types of clients: the government ("Public Work"), and private-sector contractors ("Private Work"). Since at least 1999, Wingra and Local 695 have been bound to two sets of collective bargaining agreements ("CBA"); one covering Public Work, the other Private Work. Wingra was obligated to make pension contributions to the Fund under both types of CBAs.

*Agreements Between Wingra and the Fund*

At all times relevant to this lawsuit, Wingra and the Fund were bound by three separate but related agreements: the Participation Agreement, the Trust Agreement, and

[1] The following facts are taken from the parties' respective statements and exhibits filed pursuant to Northern District of Illinois Local Rule 56.1. The Court reviews each Local Rule 56.1 statement and disregards any argument, conclusion, or unsupported assertion found therein. *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006).

the Pension Agreement. The Participation Agreement set forth Wingra's contribution obligations in the event of a CBA's termination:

> This Agreement and the obligation to pay contributions to the Fund will continue after the termination of a collective bargaining agreement . . . . This Agreement and the Employer's obligation to pay contributions shall not terminate until either a) the Trustees decide to terminate the Agreement and provide written notice of their decision to the Employer or b) the Employer is no longer obligated by a contract or statute to contribute to the Fund and the Fund has received a written notice . . . which describes the reason why the Employer is no longer obligated to contribute.

The Participation Agreement further obligated Wingra to be bound by the Trust Agreement. The Trust Agreement specifies that the Fund shall be the only pension fund to which Wingra may make pension contributions pursuant to a CBA with Local 695. It also contains a provision obligating Wingra to continue to make pension contributions unless the Fund receives a signed agreement altering Wingra's duty to contribute, or written notification that Wingra is withdrawing from the Fund or reducing its contributions.

Finally, Wingra was bound to the Pension Agreement, which provided for forty-one benefit schedules. Each schedule differed in the amount of retirement benefits offered to beneficiaries and the amounts that participating employers were required to contribute. Several of the schedules permitted employers to choose between hourly, daily, or weekly contribution rates.

*CBAs Between Wingra and Local 695*

Wingra and Local 695 were subject to three successive "Heavy and Highway Construction Agreements" ("HHA") covering Public Work performed from 2001 to 2016. The first was in effect from May 1, 2001 through April 30, 2006 ("2001 HHA"). Its successor was in effect from May 1, 2006 through April 30, 2011 ("2006 HHA"). The 2006 HHA was replaced by an agreement covering the period from May 1, 2011 through April 30, 2016 ("2011 HHA"). Each HHA called for Wingra to make pension contributions to the Fund at hourly contribution rates in accordance with the Fund's Schedule 18 pension benefit class ("Schedule 18"). Additionally, each of the HHAs identified the specific hourly pension rate in place for each year.

In 1999 Wingra and Local 695 executed the first of four agreements covering Private Work. The Madison Area Dump Truck Agreement ("DTA") was in effect from June 1, 1999 through May 31, 2003 and provided for Wingra to make pension contributions to the Fund on a weekly basis in accordance with the Fund's Schedule 17B pension benefit plan ("Schedule 17B"). Wingra and Local 695 soon thereafter executed an Addendum to the 1999 DTA which changed the 1999 DTA's weekly pension contribution requirement to a daily rate.

In 2003, Wingra and Local 695 executed an addendum to the 2001 HHA that covered Private Work ("2003 Addendum"). The 2003 Addendum was in force from

June 1, 2003 through April 30, 2006. The 2003 Addendum, which incorporated the HHA's pension provision, stated:

> Fringe benefits (e.g., health and welfare and pension) which apply under the Heavy and Highway Agreement between Wingra . . . and Wisconsin Teamsters Joint Council No. 39 shall apply under this Contract to the extent in which they are applicable under that Heavy and Highway Construction Agreement.
>
> Pension contributions on days where employees work portions of their shifts under both Agreements shall be the hourly contribution rate per the applicable contribution class in effect. On days where only private work is performed, the applicable daily rate may be used.
>
> The hourly health and welfare rate shall be used for all work performed under either Contract.

Wingra and Local 695 signed a successor agreement to the 2003 Addendum in 2006 ("2006 Addendum"). The 2006 Addendum's pension provision was identical to the provision in the 2003 Addendum, except that the second sentence of the second paragraph – "On days where only private work is performed, the applicable daily rate may be used" – was excised from the section. The 2006 Addendum provided that it would be in effect from June 5, 2006 through May 31, 2008, and that it would automatically renew annually unless either party gave timely notice to the other party of its desire to amend or terminate the agreement.

*Wingra's Participation in the Fund Relevant to this Lawsuit*

On May 28, 2003, Mark Hermann ("Hermann"), Local 695's business representative, received a letter from the Fund's Contributions Department advising him that the Fund's Trustees approved his proposal that an addendum to the HHA be negotiated with Wingra covering Private Work. The addendum would replace the DTA and require Wingra to make hourly contributions to the Fund's pension fund at the Schedule 18 level. Wingra maintains that it was unaware of Local 695's proposal to the Fund or the Fund's approval of it.

From June 2003 through May 2009, Wingra submitted contributions and reports to the Fund at the Schedule 18 hourly contribution rate for all work performed by covered employees. Wingra did so despite a letter sent from Local 695 on March 19, 2008, that stated that it was "desirous of amending portions of" the 2006 Addendum (the "March 19th letter"). Sometime in 2007, Bob Shea ("Shea"), Wingra's president, discovered this practice and determined that Wingra was not obligated to pay the Schedule 18 rate for Private Work. Shea testified that he attempted to obtain the Schedule 17B rate from Hermann, but that Hermann refused Shea's request.

In June of 2009, Wingra began to submit contributions to the Fund at the Schedule 17B weekly rate. It did so in accordance with the 2008 DTA , an agreement to which Wingra was not a party. Shea sent a letter dated July 10, 2009, to the Fund

and Local 695 informing them of his action. From June 2009 through April 2012, Wingra continued to make hourly contributions at the Schedule 18 rate for all Public Work, but contributed at the Schedule 17B weekly rate for all Private Work performed.

In September 2010, Wingra filed an unfair labor practice charge ("ULP") with the National Labor Relations Board ("NLRB") against Local 695 claiming that the 2006 Addendum was still in effect. On February 4, 2011, Wingra sent a letter to Herman informing him of its intent to terminate the 2006 Addendum in its entirety on April 30, 2011.[2] Some time prior to September of 2012, Local 695 filed a ULP with the NLRB against Wingra for, *inter alia*, failing and refusing to make benefit payments in the correct amount. On September 28, 2012, the NLRB dismissed the ULP because it was filed after the six-month statute of limitations set forth in the National Labor Relations Act.

With respect to Wingra's obligation to contribute for Public Work performed, Wingra was obligated to contribute at the hourly rate of $7.30 from June 1, 2010 through April 30, 2011. From June 1, 2011 until April 30, 2012, the hourly contribution rate increased to $7.70 per hour under the 2011 HHA. However from June 2011

[2] Wingra objects to admission of the letter as evidence on the basis that the letter's contents constitute a settlement offer. *See* Fed. R. Evid. 408(a). The objection is overruled, as the letter does not communicate a desire to negotiate or settle a dispute, but rather to terminate an agreement. *See* *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 689 (7th Cir. 2005).

through January 2012, Wingra continued to contribute at the $7.30 rate, thereby accruing a $4,464.30 delinquency.

*Procedural History*

On September 8, 2011, the Fund filed a complaint claiming that Wingra violated Section 515 of ERISA, 29 U.S.C. § 1145, by failing to make contributions in accordance with its obligations under the 2006 Addendum and 2011 HHA, the Participation Agreement and the Trust Agreement. Now before the Court are the parties' cross-motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c); *Protective Life Ins. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011). A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). When ruling on cross-motions for summary judgment, the Court views all facts and draws all reasonable inferences in favor of the party against whom the motion under consideration is made. *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011).

## DISCUSSION

The Fund moves for judgment under 29 U.S.C. § 1145, which requires employers obligated under a CBA to make contributions to an employee benefit fund consistently with the CBA's terms. The Fund seeks allegedly unpaid contributions under the 2006 Addendum and the 2011 Public CBA. Specifically, the Fund argues that Wingra short-changed the Fund with respect to the 2006 Addendum from June 2009 through April 2012 ($51,499.39), and the 2011 Public CBA from June 2011 through January 2012. ($4,464.30). The Fund also seeks statutory damages under 29 U.S.C. § 1132(g)(2). Wingra's cross-motion seeks judgment absolving it of any liability with respect to allegedly deficient contributions under the 2006 Addendum.

### I. Contributions Under the 2011 HHA

The Fund seeks summary judgment for unpaid contributions under the 2011 HHA from June 2011 through January 2012. The uncontested evidence shows that Wingra was bound by the 2011 HHA to pay a contribution rate of $7.70 for every hour of Public Work performed by covered employees. However, from June 2011 through January 2012, Wingra paid the previous year's rate of $7.30 per hour of Public Work performed. The Fund asserts, and Wingra agrees, that the sum of Wingra's delinquencies over this period equals $4,464.30. Since there is no dispute as to Wingra's liability and the amount that it owes, the Fund's motion for summary judgment is granted.

## II. Contributions Under the 2006 Addendum

### A. Interpreting Article 8 of the 2006 Addendum

The Fund contends in its motion for summary judgment that the 2006 Addendum required Wingra to make pension contributions at the Schedule 18 hourly rate for all work performed by covered employees. Wingra counters in its cross-motion for summary judgment that it was required to make contributions at the lesser Schedule 17B daily rate on days when covered employees performed only Private Work. Because the dispute revolves around allegedly deficient contributions while the 2006 Addendum was in effect, we analyze that agreement.

Summary judgment is a particularly appropriate vehicle to interpret written contracts. *Moriarty v. Svec*, 164 F.3d 323, 330 (7th Cir. 1998). "When interpreting contracts, terms are given their ordinary and popular meaning, the document is read as a whole with all its parts given effect, and related documents are read together." *Temme v. Bemis Co.*, 622 F.3d 730, 734 (7th Cir. 2010) (citations and quotations omitted). When a contract's terms are unambiguous, the Court may declare its meaning as a matter of law. *Central States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 910 (7th Cir. 2000). A contract is unambiguous if it is subject to only one reasonable interpretation. *Ill. Conference of Teamsters and Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir. 1994). "The reasonableness of a proposed

interpretation of contractual language requires consideration of the contract as a whole, including terms incorporated by reference." *Chi. Dist. Council of Carpenters Pension Fund v. K&I Constr., Inc.*, 270 F.3d 1060, 1069 (7th Cir. 2001). The terms of a contract are read consistently through the whole of the document, together with related documents. *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011). Where the terms of a contract lead to one reasonable meaning, the Court is to adjudicate the matter without the aid of extrinsic evidence. *Trs. of S. Ill. Carpenters Welfare Fund v. RFMS, Inc.*, 401 F.3d 847, 849 (7th Cir. 2005).

With these principles in mind, the Court begins its analysis by examining the pension provision of the 2006 Addendum. Article 8 of the 2006 Addendum states:

> Fringe benefits (e.g., health and welfare and pension) which apply under the Heavy and Highway Agreement between Wingra . . . and Wisconsin Teamsters Joint Council No. 39 shall apply under this Contract to the same extent in which they are applicable under that Heavy and Highway Construction Contract.
>
> Pension contributions on days where employees work portions of their shifts under both Agreements shall be the hourly contribution rate per the applicable contribution class in effect.
>
> The hourly health and welfare rate shall be used for all work performed under either Contract.

The parties agree that Article 8 requires Wingra to contribute at the Schedule 18 hourly rate for both Public and Private Work when both types of work are performed in a single day. The Court agrees with this interpretation. The first paragraph of Article 8 indicates that the parties intended for pension benefits to "apply" to the 2006 Addendum to the same extent as under the HHA. The 2006 HHA's pension provision calls for Wingra to make hourly contributions to the Fund at the hourly Schedule 18 rate for all Public Work performed. Additionally, the second paragraph of Article 8 calls for Wingra to contribute to the Fund at the "hourly contribution rate per the applicable contribution class in effect" when both Public and Private Work are performed in a single day.

The parties' reading of Article 8 diverge from there. Wingra's cross-motion contends that the 2006 Addendum requires it to contribute to the Fund at the Schedule 17B daily contribution rate on days when only Private Work is performed. However, neither the 2006 Addendum nor the 2006 HHA make any mention of the Schedule 17B rate. Nor does either agreement call on Wingra to contribute at a daily contribution rate.

Wingra instead bases its theory on the premise that the 2003 Addendum called for a two-tiered contribution scheme, as was the case prior to 2003 when the parties maintained both the HHA and DTA. Wingra further asserts that the pension provision

within the 2003 Addendum was implicitly imported into the 2006 Addendum. Specifically, Wingra cites to language found in the 2003 Addendum's pension provision that obligated it to contribute at the "applicable daily rate" on days when only Private Work was performed. We disagree with Wingra for three reasons. First and most importantly, Article 10 of the 2006 Addendum expressly repudiated any force that the DTA had over the parties. The provision states:

> Upon full execution of this Addendum to the Heavy and Highway Agreement, the parties agree that [Wingra] is no longer bound by the terms and conditions of the Madison Area Dump Truck Agreement as the Addendum replaces said Agreement.

The 2003 Addendum contains similar language. Since the DTA was the only CBA between the parties containing the Schedule 17B rate, this provision dispels any claim to an obligation to contribute at that rate. Second, there is no other evidence within the 2006 Addendum or the 2006 HHA showing that Wingra and Local 695 intended to incorporate the 2003 Addendum in any way. The only other CBA that the 2006 Addendum refers to is the HHA. In fact, as the 2003 Addendum's successor, execution of the 2006 Addendum rendered its predecessor defunct. *See Beverage Indus. Local No. 744 Health & Welfare Fund v. Quality Beers Ltd. Pshp.*, 58 F. Supp. 2d 910, 915 (N.D. Ill. 1999) ("[W]hen documents are not executed simultaneously and their terms conflict, the latter executed of the two takes precedent over the earlier one.") (*citing Diehl v. Twin Disc*, 102 F.3d 301, 307 (7th Cir. 1996)). Third, even if we were to find

that the parties intended for the 2003 Addendum to inform their understanding of the 2006 Addendum, the 2003 Addendum sheds no lights on the parties' purported intent to utilize the Schedule 17B rate. In addition to specifically incorporating the HHA, the 2003 Addendum required Wingra to contribute at the "applicable daily rate" on days where only Private Work is performed. Nowhere in the 2003 Addendum or in the 2001 HHA – the HHA in effect for the duration of the 2003 Addendum – is there any reference to the Schedule 17B rate. Because Wingra's argument is not supported with any evidence in the contractual language in the record, its cross-motion for summary judgment on these grounds is denied.

On the other hand, the Fund argues that the 2006 Addendum, read together with the 2006 HHA, requires Wingra to contribute at the Schedule 18 rate for all hours worked. This position strikes us as reasonable. While Article 8 of the 2006 Addendum makes no mention of a specific pension rate, it expressly incorporates the HHA. The 2006 HHA identifies the Schedule 18 hourly rate as the operative rate for Public Work. Moreover, Article 8 demonstrates the parties' intent that the pension requirements under the 2006 Addendum "shall apply . . . to the same extent" as under the HHA. In light of the 2006 HHA identifying the Schedule 18 hourly rate and the 2006 Addendum's incorporation of the HHA, we find that the only reasonable conclusion one could draw

is that Article 8 required Wingra to contribute for both Public and Private Work at the Schedule 18 hourly rate.

Even if we were to find that Article 8's meaning was ambiguous, the extrinsic evidence convinces us that Article 8 called for Wingra to contribute at the Schedule 18 hourly rate for all work performed. If a contract is ambiguous and extrinsic evidence is undisputed, interpretation of the contract remains a question of law for a court to decide. *Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 456 (7th Cir. 1991).

Here, the undisputed evidence shows that from June 2003 through May 2009, Wingra submitted contribution reports and payments to the Fund for all Private Work performed at the Schedule 18 hourly rate. Wingra's "conduct in paying the higher rates uncomplainingly shows that it acquiesced" to contributing at the Schedule 18 hourly rate. *See Operators Engineers Local 139 Health Benefit Fund v. Gustafson Constr. Co.*, 258 F.3d 645, 649 (7th Cir. 2001); *see also Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998) (The parties' course of dealing may be used to help determine their contractual intent). While Wingra claims that it paid the Schedule 18 rate as a result of an administrative error, its mistake would not be enough to escape a finding that it was bound to contribute at the Schedule 18 rate. A party's unilateral mistake may be grounds for rescission only if enforcement of the contract would be unconscionable, or the non-challenging party caused the mistake or had reason to know

of the mistake. Restatement (Second) of Contracts, § 153. Wingra submits no evidence suggesting the Fund was aware of Wingra's mistake or that the Schedule 18 rate was unconscionable. If anything, Wingra's compliance with the Schedule 18 rate for six years suggests the opposite.

Wingra also contends that its receipt of the March 19th letter conveying Local 695's desire to amend the 2006 Addendum terminated the CBA, thereby absolving Wingra of any liability as of April 30, 2008. Wingra invokes the termination provision of the 2006 Addendum, which states in relevant part:

> This Addendum shall be for the period June 5, 2006 through May 31, 2008 . . . and shall automatically renew itself from year to year . . . unless either party gives notice to the other of their desire to amend, add to or terminate this Addendum.

However, evidence in the record indicates that Wingra continued to operate under the belief that the 2006 Addendum remained in effect. For example, in September 2010, Wingra filed a ULP against Local 695 asserting that the CBA was still in effect. Further, on February 4, 2011, Wingra sent a letter to Local 695 stating that the CBA would not terminate until April 30, 2011. Thirdly, there is no evidence that Wingra ever ceased contributing to the Fund at any point after it received the March 19th letter. Its uninterrupted conduct in abiding by the terms of the 2006 Addendum strongly favors the inference that it remained bound by the CBA. *See Gustafson*, 258 F.3d at 649. Moreover, each contribution was accompanied with a report stating that Wingra

"reaffirms its obligation to make contributions required by the Collective Bargaining Agreement, [and] accepts and agrees to be bound by the Fund trust agreement." Despite the boilerplate character of the reports, the Seventh Circuit has found that such pronouncements are entitled to evidentiary weight. *See id.* at 650 (Although language found in certification reports was "boilerplate . . . it was entitled to some weight . . . and maybe a lot, as we suggested in *Moriarty v. Larry G. Lewis Funeral Directors, Ltd.*, 150 F.3d 773, 775 (7th Cir. 1998)). Ultimately, rather than putting forth evidence contradicting the Fund's evidence, Wingra is seeking to create a material issue of fact by its own inconsistent conduct. In light of Wingra's conduct and the evidence in the record, no reasonable jury could differ on those grounds.

In light of the unambiguous language in the 2006 Addendum and the 2006 HHA, we find that Article 8 of the 2006 Addendum obligates Wingra to contribute at the Schedule 18 hourly rate for all types of work performed. Further, Wingra's continuing reaffirmation of the 2006 Addendum demonstrate that it remained bound to the CBA after 2008. The Fund's motion for summary judgment is granted, and Wingra's cross-motion for summary judgment is denied.

**B. Estoppel**

Wingra contends that the Fund is estopped from recovering allegedly delinquent contributions under the 2006 Addendum due to Local 695's failure to challenge

Wingra's unilateral decision to contribute at the Private Rate on June 1, 2009 by timely filing a ULP with the NLRB.

Wingra's argument is without merit. The Fund is suing under ERISA to recover delinquent contributions that Wingra was contractually obligated to make. The Court retains exclusive jurisdiction over claims brought under ERISA. *See* 29 U.S.C. § 1132(e)(1). Whether Local 695 or the Fund enforced their respective rights under the National Labor Relations Act is irrelevant to the Fund's ERISA claim. Wingra's cross-motion for summary judgment on this basis is denied.

## III. Damages

An ERISA action brought by a plan fiduciary to enforce a CBA under 29 U.S.C. § 1145 is entitled to recover unpaid contributions; interest on unpaid contributions; reasonable attorney's fees and costs; liquidated damages or double interest, whichever is greater; and other legal and equitable relief. 29 U.S.C. § 1132(g)(2). The Fund seeks to recover for contribution deficiencies, statutory damages, and post-judgment damages under the Trust Agreement.

The Fund seeks unpaid contributions and accrued interest under the 2006 Addendum and the 2011 HHA. The Fund performed an audit of Wingra's books for the period of June 2009 through April 2012. The audit reveals that Wingra owes the Fund a sum of $55,963.69 in deficient contributions and an additional $7,455.44 in interest.

Wingra raises no material dispute with the auditor's calculation. The Fund accordingly is entitled to unpaid contributions and interest under the 2006 Addendum and 2011 HHA in those amounts. *See id.*(A), (B).

Next, the Fund requests damages under 29 U.S.C. § 1132(g)(2)(C), which permits a plan fiduciary to recover interest on unpaid contributions, or liquidated damages under the plan up to 20% of unpaid contributions, whichever amount is greater. Here, the Trust Agreement provides for liquidated damages in the amount of 20% of unpaid contributions. Twenty percent of $55,963.69 equals $11,192.74. This amount being greater than the $7,455.44 in interest on the unpaid contributions, we find that Wingra is liable for $11,192.74 in liquidated damages under the Trust Agreement and 29 U.S.C. § 1132(g)(2)(C). *Id.*

Additionally, the Fund requests that Wingra reimburse it for audit costs and fees. A prevailing party may recover audit costs under 29 U.S.C. § 1132(g)(2)(E), so long as that party demonstrates that the costs were necessary and reasonable. *Trs. of Chi. Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 906 (7th Cir. 2009); *Moriarty v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005). The Fund submits detailed time sheets showing that the audit required 206 hours of work at an hourly rate of $75, which comes out to $15,450.00. The Court is satisfied that these costs were reasonable and necessary, and accordingly award the Fund these costs. The Fund also claims

$364.00 in "Out-of-Pocket Expenses," but does not verify these costs with any explanation or receipts demonstrating the necessity of these costs. The Fund therefore may not recover these costs.

Finally, the Fund is entitled to reasonable attorney's fees and costs under 29 U.S.C. § 1132(g)(2)(D). Also, the Fund is entitled post-judgment interest at either 7.5% interest or 2% plus the prime interest rate established by JP Morgan Chase Bank, NA, as provided for under the Trust Agreement. *Cent. States, Se. & Sw. Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1019-20 (7th Cir. 2001).

**CONCLUSION**

For the aforementioned reasons, the Fund's motion for summary judgment is granted, and Wingra's cross-motion for summary judgment is denied. The Fund is entitled to a judgment of $90,061.87, plus attorney's fees and costs and post-judgment interest.

Charles P. Kocoras
Charles P. Kocoras
United States District Judge

Dated: February 26, 2013